# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| TYRIA R., | § | |
|       Plaintiff, | § | |
| | § | |
| | § | Civil Action No. 3:19-CV-0109-S-BH |
| | § | |
| ANDREW SAUL, | § | |
| COMMISSIONER OF SOCIAL | § | |
| SECURITY ADMINISTRATION, | § | |
|       Defendant. | § | Referred to U.S. Magistrate Judge[1] |

## FINDINGS, CONCLUSIONS, AND RECOMMENDATION

Tyria R. (Plaintiff) seeks judicial review of a final decision by the Commissioner of Social Security (Commissioner)[2] denying her claim for disability insurance benefits (DIB) under Title II of the Social Security Act. (*See* docs. 1; 12.) Based on the relevant filings, evidence, and applicable law, the Commissioner's decision should be **REVERSED in part**, and the case should be **REMANDED** for reconsideration.

## I. BACKGROUND

On July 13, 2015, Plaintiff filed her application for DIB, alleging disability beginning on November 6, 2011. (doc. 7-1 at 285-87.)[3] Her claim was denied initially on November 3, 2015 (*Id.* at 212), and upon reconsideration on March 16, 2016 (*id.* at 218). On March 18, 2018, Plaintiff requested a hearing before an Administrative Law Judge (ALJ). (*Id.* at 221.) She appeared and

---

[1] By *Special Order No. 3-251*, this social security appeal was automatically referred for proposed findings of fact and recommendation for disposition.

[2] At the time this appeal was filed, Nancy A. Berryhill was the Acting Commissioner of the Social Security Administration, but Andrew Saul became the Commissioner of the Social Security Administration on June 17, 2019, so he is automatically substituted as a party under Fed. R. Civ. P. 25(d).

[3] Citations to the record refer to the CM/ECF system page number at the top of each page rather than the page numbers at the bottom of each filing.

testified at a hearing on June 21, 2018.  (*Id.* at 84-146.)  On August 31, 2018, the ALJ issued a decision finding her not disabled.  (*Id.* at 29.)

Plaintiff timely appealed the ALJ's decision to the Appeals Council on September 25, 2018. (*Id.* at 287-88.)  The Appeals Council denied her request for review on November 9, 2018, making the ALJ's decision the final decision of the Commissioner.  (*Id.* at 5-7.)  She timely appealed the Commissioner's decision under 42 U.S.C. § 405(g).  (*See* doc. 1.)

### A.    Age, Education, and Work Experience

Plaintiff was born on December 16, 1971, and was 46 years old at the time of the hearing. (doc. 7-1 at 95.)  She graduated high school and could communicate in English.  (*Id.*)  She had past relevant work as a correctional officer, a supply technician/supplies clerk, a shipping and receiving clerk, and a supply supervisor. (*Id.* at 120-21.)

### B.    Medical Evidence

From December 6, 2007 through May 11, 2018, Plaintiff had a Veterans Administration (VA) service-connected disability rating of 100%[4], and received medical treatment at Waco VA Medical Center, Temple VA Clinic, and Central Texas VA Medical Center (collectively, VA Clinic), for multiple conditions, including major depressive disorder, obesity, low back pain, hypertension, lupus anticoagulant disorder, sciatica, PTSD, anxiety disorder, fatigue syndrome, rhinitis, irritable bowel syndrome (IBS), lumbar spinal stenosis, dyshidrosis, dry eye syndrome, xerosis, dyschromia, mixed incontinence, calcaneal spur, dermatitis, and carpal tunnel syndrome. (docs. 7-1 at 497-621, 627-1177; 7-2 at 1-382, 585-796, 878-1162.)

---

[4]The breakdown of Plaintiff's service-connected disability rating by medical impairment was 70 percent to PTSD; 20 percent to removal of uterus; 30 percent to irritable colon; 20 percent to paralysis of musculospiral nerve; 20 percent to flat foot condition; 20 percent to degenerative arthritis of spine; 10 percent to limited flexion of knee; and 10 percent to superficial scars. (*See* doc. 7-1 at 788.)

      1.      **Physical Impairments**

On April 18, 2013, Plaintiff presented to the VA Clinic with chronic right leg pain that started a couple of years ago, which she rated a 6 in severity, and forearm pain, and she was examined by Nurse Practitioner (NP) Mary Ireland. (doc. 7-1 at 1172-73.) She described the pain as radiating and throbbing, and it worsened with prolonged walking, sitting, standing, and weather. (*Id.*) Plaintiff was able to ambulate and stand independently; was oriented to person, place, and time; had clear and appropriate speech; appeared neat and clean; and acted friendly, pleasant, and cooperative. (*Id.*) On September 9, 2013, she was referred to kinesiotherapy and issued an elevating toilet seat and a rollator walker for her back pain. (*Id.* at 802, 1133.) On October 10, 2013, she reported wearing a back brace on a regular basis. (*Id.* at 527.)

On September 24, 2014, Plaintiff presented to Jha Swastika, M.D., for a rheumatology evaluation. (doc. 7-1 at 783-87.) Her past medical history included sleep apnea, gastrointestinal (GI) bleeding, anemia, asthma, seasonal allergies, and chronic low back pain. (*Id.* at 785.) She reported worsening diffuse pain in the back, shoulders, chest wall, and thighs, which restricted her ability to participate in daily activities. (*Id.* at 783.) She obtained no relief from medications and had to discontinue nonsteroidal anti-inflammatory drugs (NSAIDs) due to GI bleeding. (*Id.*) She had carpal tunnel surgery in both hands but continued to have some numbness. (*Id.* at 785.) Dr. Swastika observed some tenderness over her left wrist, but she had full grip and fist strength in both hands. (*Id.* at 786.) He noted full shoulder abduction and internal rotation, no knee or ankle effusion, no metatarsophalangeal (MTP) tenderness, and no apparent focal neurological deficit. (*Id.*) Dr. Swastika assessed chronic widespread pain or fibromyalgia based on tender point examination, as well as nicotine dependence. (*Id.* at 787.) Even though there were two positive screens for positive

lupus anticoagulation, he recommended additional laboratory tests for lupus because she did not fulfill the criteria for lupus or any other autoimmune connective tissue disorder. (*Id.* at 786.)

On April 30, 2015, NP Ireland issued a letter stating that Plaintiff was a service-connected disabled veteran who suffered from permanent health related problems, including hypertensive disorder, lupus anticoagulant disorder, sciatica, major depressive disorder, PTSD, anxiety disorder, chronic fatigue syndrome, IBS, lumbar spinal stenosis, and carpal tunnel. (*Id.* at 604-05.) It stated that she was "increasingly less able to care for her own personal and household needs and require[d] the assistance of family to assist her on a daily basis." (*Id.* at 605.)

From August 17 to October 9, 2015, Plaintiff attended twelve kinesiotherapy sessions for arthritis and "tolerated treatment well." (docs. 7-1 at 830-31, 852-53; 7-2 at 258-64.) On October 9, 2015, David F. Butler, M.D., assessed Plaintiff with vasculitis related to underlying collagen vascular disease. (doc. 7-1 at 825.) On October 16, 2015, Plaintiff was discharged from the kinesiotherapy program "due to multiple no shows and cancellations prior to completion of program." (*Id.* at 824.)

On October 28, 2015, State Agency Medical Consultant (SAMC) George Carrion, M.D., completed a physical residual functional capacity (RFC) assessment based on the medical evidence. (*Id.* at 181-83.) He opined that Plaintiff had the physical RFC to lift and carry 20 pounds occasionally and 10 pounds frequently; stand and walk for about 4 hours in an 8-hour workday; sit for about 6 hours in an 8-hour workday; push and pull unlimited weight (other than shown for lift and carry) with no restrictions on hand or foot controls; occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; and occasionally balance, stoop, kneel, crouch, and crawl, with no manipulative, visual, communicative, or environmental limitations. (*Id.* at 181-82.) Dr. Carrion

4

opined that Plaintiff's alleged symptoms were reasonably expected based on her medically determined impairments, but her alleged limitations were not fully supported by the evidence of record. (*Id.* at 183.)

On December 22, 2015, Plaintiff arrived by ambulance at Seton Medical Center (Seton) after being involved in a motor vehicle accident. (doc. 7-2 at 427-34.) She complained of left hip and shoulder pain and headache, and rated her pain 8/10. (*Id.* at 430-31.) Joseph Heidenreich, M.D., assessed cervical and lumbar sprains, prescribed pain medication, and discharged her the same day. (*Id.* at 428.) On December 24, 2015, Plaintiff returned to Seton with body aches, and reported sharp pain in her left leg and shoulder/neck/rib, as well as swelling and stiffness. (*Id.* at 420.) The examining doctor noted that her x-rays were normal, assessed her with muscle spasms, and instructed her to continue with her current pain medication. (*Id.* at 418.)

On February 2, 2016, Plaintiff presented to Dr. Swastika at the VA Clinic with arthralgias, malaise, dry eyes, and acid reflux. (*Id.* at 78-85.) She reported worsening body aches from her car accident and dealing with anxiety, frustration, depression, and PTSD. (*Id.* at 78-79.) She had fibromyalgia with chronic widespread pain, positive lupus anticoagulant, and positive anti-cardiolipin antibody. (*Id.* at 78.) Dr. Swastika assessed undifferentiated connective tissue disease and fibromyalgia. (*Id.*) He advised dieting and exercising to decrease weight, and instructed Plaintiff to continue with Gabapentin, Duloxetine, and her pain medications. (*Id.* at 83.)

On March 8, 2016, SAMC Yvonne Post, D.O., completed a physical RFC that mirrored Dr. Carrion's physical RFC. (doc. 7-1 at 199-200.) She also affirmed Dr. Carrion's opinion finding that Plaintiff's alleged limitations were partially supported by the medical evidence and other evidence in the file. (*Id.* at 200.)

5

From September 1, 2016 through April 24, 2018, Plaintiff received pain treatment at Advanced Pain Care (Advanced Pain) for lumbago, cervicalgia, fibromyalgia, and chronic pain syndrome. (doc. 7-2 at 465-584, 1164-1352.) Her medication regimen included Hydroxyzine HCL, Gabapentin, Norco, Cyclobenzaprine, Trazodone, Tramadol, Methocarbamol, Percocet, and Morphine. (*Id.* at 469-76.) On September 1, 2016, Plaintiff presented to Kristian Delgado, M.D., and reported axial and radicular back and neck pain. (*Id.* at 522.) She described the pain as sharp, burning, throbbing, shooting, aching, crushing, and 7/10 in severity. (*Id.*) Dr. Delgado physically examined Plaintiff and noted decreased cervical and lumbar range of motion, normal thoracic range of motion, normal gait, and normal strength and sensation in extremities. (*Id.* at 524.) She assessed worsened lumbago, cervicalgia, fibromyalgia, and chronic pain syndrome, and referred Plaintiff for spinal imaging studies. (*Id.* at 525-26.)

On November 16, 2016, Plaintiff presented to the VA Clinic for multiple imaging studies. (*Id.* at 485-500.) A left shoulder MRI showed intermediate grade undersurface tears of the supraspinatus and infraspinous tendons, moderate acromioclavicular arthropathy, and enlarged right axillary lymph nodes. (*Id.* at 486-87.) A left knee MRI showed possible medial meniscal tear and medial and patellofemoral compartment chondrosis. (*Id.* at 489-90.) A thoracic spine MRI showed multilevel thoracic spine disc disease. (*Id.* at 492-93.) A lumbar spine MRI showed lumbar disc and facet degenerative changes with mild to moderate central canal stenosis at L4-5 and L5-S1, moderate right and moderate to severe left neural foraminal stenosis at L4-5, severe left neural foraminal stenosis at L5-S1, moderate to severe L4-5 and mild to moderate facet left L5-S1 facet arthropathy, and small inferior central disc extrusion or disc sequestration at L5-S1. (*Id.* at 495-96.) A cervical spine MRI showed multilevel disc disease from C3 through C7, with mild to moderate central canal

6

stenosis at C6-7, and variable neural foraminal stenosis.  (*Id.* at 499-500.)

On December 29, 2016, Plaintiff returned to Advanced Pain and received bilateral lumbar facet injections at L3-L5. (*Id.* at 508-11.)  On February 9, 2017, she reported constant and aching pain in her lower back, both hips, and tail bone. (*Id.* at 555.)  Her pain was 7/10 in severity and worsened with daily activities and excess walking.  (*Id.*)  Physical examination showed decreased cervical and lumbar range of motion, but normal strength and full range of motion in the upper and lower extremities. (*Id.* at 557.)  She was advised to continue with physical therapy and her current pain medications.  (*Id.* at 558.)  Plaintiff also received bilateral lumbar facet injections at L2-L5, but only reported 10% pain relief. (*Id.* at 515, 1196.)

On March 7, 2017, hip MRIs showed mild bilateral hip degenerative changes, suspected acetabular labral tears, with mild left hip subchrondral cystic changes, and mild bilateral greater trochanteric bursitis with mild right gluteal tendinitis. (*Id.* at 396-97.)

On March 14, 2017, Plaintiff presented to Roy Lewis, M.D., with increasing left shoulder pain.  (*Id.* at 802-805.)  She reported decreased range of motion and being unable to wash herself because of pain.  (*Id.* at 803.)  Dr. Lewis assessed chronic impingement/subacromial bursitis of the left shoulder and administered a cortisone shot.  (*Id.* at 805.)  On April 19, 2017, Plaintiff returned to Dr. Lewis with severe left shoulder pain secondary to acromial impingement.  (*Id.* at 798-800.)  She failed a cortisone injection done in February 2017, and reported that increasing left shoulder pains had affected her activities of daily living.  (*Id.* at 799.)  Dr. Lewis physically examined Plaintiff and assessed acromial impingement and acromioclavicular joint degenerative joint disease. (*Id.* at 800.)  Because she failed all non-operative intervention, Dr. Lewis recommended surgical intervention. (*Id.*)  On May 15, 2017, Dr. Lewis performed left shoulder arthroscopic acromioplasty

7

and distal clavicle resection. (*Id.* at 807-09.)

On August 17, 2017, Plaintiff returned to Advanced Pain for bilateral sacroiliac injections and bilateral greater trochanteric bursa injections, and she was noted to have "tolerated the injections well without any signs of motor weakness or other complications." (*Id.* at 1301.)  On October 31, 2017, she was administered a piriformis muscle injection for hip joint pain and trigger point injections for chronic pain syndrome, and reported 50% pain relief.  (*Id.* at 1196, 1276-77.)  On December 28, 2017, she received a lumbar transiaminar epidural steroid injection at L4-L5 and reported 20% pain relief. (*Id.* at 1196, 1248.)  On November 30, 2017, a nerve conduction velocity and electromyography (NCV/EMG) study showed moderate to moderately severe median neuropathy at the left wrist. (*Id.* at 998-99.)

On December 14, 2017, Plaintiff presented to Alisha Marie Honds, D.O., at the VA Clinic for a gastroenterology evaluation. (*Id.* at 987.)  She reported constipation and cramping for years, and had frequent diarrhea with abdominal cramping over the past year. (*Id.*)  Dr. Honds assessed IBS or Gastroesophageal reflux disease, and ordered a colonoscopy.  (*Id.* at 992.)  On January 10, 2018, a colonoscopy showed severe left-sided diverticulosis coli. (*Id.* at 959.)

On January 21, 2018, Plaintiff returned to Advanced Pain and received bilateral knee sacroiliac injections. (*Id.* at 1196.)  On February 13, 2018, she received bilateral sacroiliac joint injections for hip joint pain and chronic pain syndrome, and reported 100% pain relief. (*Id.* at 1196, 1230.)

On April 12, 2018, Plaintiff presented to the ER at Seton with a cough and shortness of breath.  (*Id.* at 851-55.)  She was assessed with acute asthma exacerbation and prescribed Albuterol and Prednisone. (*Id.* at 854-55.)  On April 19, 2018, she was prescribed a nebulizer through the VA

Clinic.  (*Id.* at 886.)

On April 26, 2018, Plaintiff returned to Seton with trapezius muscle spasms and lateral neck pain.  (*Id.* at 860-63.)  She was offered a Toradol injection and prescription of Tramadol, but refused treatment. (*Id.* at 861.)  From January 29 to March 1, 2018, she attended pool therapy sessions for pain management.  (*Id.* at 869-77.)

### 2.    Mental Impairments

On September 9, 2011, VA clinical psychologist Jordan Layne completed a PTSD Disability Benefits Questionnaire (DBQ) for Plaintiff. (doc. 7-1 at 546-59.)  He noted that she had been diagnosed with PTSD and depressive disorder, and had a current Global Assessment of Functioning (GAF) score of 65. (*Id.* at 546-47.)  Her symptoms included depressed mood, anxiety, chronic sleep impairment, mild memory loss, and disturbances of motivation and mood.  (*Id.* at 557.)  Dr. Layne opined that Plaintiff's PTSD symptoms would cause clinically significant distress or impairment in social, occupational, or other important areas of functioning. (*Id.* at 556-57.)

From January 6, 2014 through August 17, 2015, Plaintiff received mental health counseling through the VA Clinic for symptoms of PTSD. (*Id.* at 441-92.)  On January 6, 2014, she had her initial counseling session with Readjustment Counselor (RC) Michael A. Hauser.  (*Id.* at 445.)  She reported sexual trauma while stationed in Bosnia and recounted a recent incident "in which her toaster sprang up and she found herself on the floor looking for cover." (*Id.*)

On January 14, 2014, Tequilla Wilson, Ph.D., interviewed Plaintiff and completed a second PTSD DBQ. (*Id.* at 1070-81.)  She noted that Plaintiff had been diagnosed with PTSD and major depressive disorder, and her GAF score in February 2012 was 55.  (*Id.* at 1074.)  She opined that Plaintiff's PTSD caused the following symptoms: depressed mood; anxiety; suspiciousness; weekly

9

panic attacks; chronic sleep impairment; mild memory loss; disturbances of motivation and mood; difficulty in establishing and maintaining effective work and social relationships; difficulty in adapting to stressful circumstances, including work or a work-like setting; and inability to establish and maintain effective relationships. (*Id.* at 1078.) She concluded that given Plaintiff's PTSD, she would "perform better in a sedentary employment environment where she is not surrounded by to[sic] many people." (*Id.* at 1079.)

On April 1, 2014, RC Hauser reported that Plaintiff would arrive for a counseling session and then disappear for long periods. (*Id.* at 469.) Although she wanted help, she had difficulty complying with treatment. (*Id.*) On examination, RC Hauser noted that Plaintiff presented as delusional with a dysthymic mood and irritable affect. (*Id.*)

On January 14, 2015, Plaintiff presented to RC Heidi Quashie-McKie for a mental status evaluation. (*Id.* at 479-83.) She reported increased irritability and self-isolation, sleep deprivation, depression, and lack of motivation. (*Id.* at 479.) RC Quashie-McKie noted rapid and pressured speech, impaired memory function, agitated and restless motor activity, impaired judgment, delusional thoughts, disorganized thinking, and low energy. (*Id.* at 481-82.) On January 21, 2015, Plaintiff reported symptoms included insomnia, hypervigilance, anxiety, isolation, pain, and anger. (*Id.* at 463-64.) On February 17, 2015, her symptoms included intrusive memories about deployment, nightmares, flashbacks, night sweats, panic attacks, avoidance behaviors, memory problems, low self-esteem, anhedonia, social isolation, emotional numbing, trouble concentrating, and hypervigilance. (*Id.* at 484-85.)

On September 30, 2015, Plaintiff presented to Psychiatric NP Susan Watson at the VA Clinic for psychiatry assessment. (*Id.* at 831-39.) She reported feeling calmer than before, but her mood

was sad.  (*Id.*)  She had mild paranoia and recently installed an alarm system at her house because she felt like someone was always at the door.  (*Id.* at 832.)  NP Watson noted mild anxiety, relaxed mood, anxious affect, and short-term memory problems.  (*Id.*)  Plaintiff reported some difficulty reading and comprehending her Bible, and she sometimes needed to re-read passages. (*Id.* at 833).  She also reported difficulty following what was being said on TV. (*Id.*)

On November 2, 2015, State Agency Psychological Consultant (SAPC) Leela Reedy, M.D., completed a Psychiatric Review Technique (PRT) for Plaintiff.  (*Id.* at 178-80.)  She noted that Plaintiff had severe affective disorders and found that she was mildly limited in activities of daily living, moderately limited in maintaining social functioning and maintaining concentration, persistence, and pace, and had no episodes of decompensation.  (*Id.* at 179.)  Dr. Reedy found Plaintiff's medical records showed symptoms of depression and PTSD, but did not reasonably show that her ability to complete a 40-hour workweek was diminished.  (*Id.* at 179-80.)  Dr. Reedy also completed a mental RFC assessment and found that Plaintiff was able to understand, remember, and carry out detailed but not complex instructions; make basic decisions; attend and concentrate for extended periods; accept instructions; and respond appropriately to changes in a routine work setting. (*Id.* at 185.)

On January 27, 2016, Plaintiff returned to the VA Clinic and reported fear of driving because of a recent car accident, and difficulty coping with depression and pain. (doc. 7-2 at 86.)  NP Watson identified Plaintiff's limitations as limited healthy coping skills, social environment problems, chronic pain/illness, and substance abuse.  (*Id.* at 92.)  She assessed PTSD, anxiety disorder, major depressive disorder, and alcohol abuse. (*Id.*)

On March 15, 2016, Sallie Boulos-Sophy, Ph.D., another SAPC, reviewed the medical

11

evidence. (doc. 7-1 at 195-202.) She affirmed Dr. Reedy's opinion finding that Plaintiff's alleged limitations were not fully supported by the medical evidence. (*Id.* at 198, 202.) Dr. Boulos-Sophy's mental RFC closely resembled Dr. Reedy's, except she found Plaintiff was able to understand, remember, and carry out *simple* instructions and interact with others. (*Id.* at 202.)

On October 14, 2016, Plaintiff presented to William Cofield, Jr., Psy.D., for a mental status examination. (*Id.* at 623-26.) She reported being angry, feeling useless, crying daily, being scared for unknown reasons, and feeling jittery. (*Id.* at 623.) She also reported difficulty sleeping and was observed sleeping in the lobby before her appointment. (*Id.*) She denied any learning disabilities and was able to handle family finances, but sometimes "double[] pa[id] things because she [did not] remember." (*Id.* at 624.) She would skip showering for 2 or 3 days when feeling bad, and her son had complained about her hygiene. (*Id.*) She stopped going to church because it was "too crowded." (*Id.* at 624-25.) Dr. Cofield noted Plaintiff's mood was both depressive and anxious, and she had "unremarkable" posture and gait but walked slowly. (*Id.*) While she denied suicidal ideation, she sometimes wished she was not alive. (*Id.*) Dr. Cofield opined that Plaintiff presented with a mixture of anxious and depressive symptoms, and he assessed major depressive disorder (recurrent, mild) and PTSD. (*Id.* at 625.) He also opined that she was capable of understanding the meaning of filing for benefits, and she was intellectually capable of managing any benefits awarded. (*Id.* at 626.)

On March 27, 2017, Plaintiff presented to the VA Clinic for a scheduled appointment and was examined by Amanda S. Green, M.D. (doc. 7-2 at 633.) She reported anxiety when driving and being out in crowds. (*Id.*) Dr. Green opined that Plaintiff was at a "chronically elevated risk for harm to self as compared to the general population due to mood symptoms, PTSD, chronic pain and illness, impulsivity, [and] history of treatment noncompliance." (*Id.* at 638.) She noted that

Plaintiff's ongoing severe anxiety was complicated by her medication noncompliance. (*Id.* at 639.) Dr. Green assessed major depressive disorder and PTSD, and advised Plaintiff to pursue supportive therapy and continue with her medications.  (*Id.* at 639-40.)

On January 11, 2018, VA clinical psychologist, Valenta Moshae Cooper, completed a third PTSD DBQ. (*Id.* at 942-47.)  On examination, Plaintiff reported that she no hobbies, did not go out, and tried to "hide from people." (*Id.* at 944.)  She felt severe anxiety daily and was scared often, "even at home." (*Id.*)  Dr. Cooper noted signs of significant paranoia and random panic episodes. (*Id.*)  Plaintiff stated that she felt anxious when around others, and that an irritable mood impacted her interactions with others.  (*Id.*)  She reported several confrontations with strangers when in public, and that "police were called during an altercation a local convenient store, but no arrests were made." (*Id.*)  She also reported emotionality, crying spells, sadness, fatigue, and limited motivation. (*Id.*)  Dr. Cooper opined that Plaintiff's PTSD caused the same symptoms identified in the second PTSD DBQ.  (*Id.* at 947.)  She further opined that Plaintiff's PTSD and major depressive disorder caused clinically significant distress or impairment in social, occupational, or other important areas of functioning. (*Id.* at 946.)

## C.    Hearing

On June 21, 2018, Plaintiff and a vocational expert (VE) testified at a hearing before the ALJ.  (doc. 7-1 at 80-142.)  Plaintiff was represented by an attorney. (*Id.* at 80.)

### 1.    Plaintiff's Testimony

Plaintiff testified that she graduated high school in 1991, was 5-feet 3 and 1/4 inches tall, and weighed 219 pounds.  (doc. 7-1 at 95-96.)  Her last job was in 2011 as a supply warehouse contractor in Afghanistan. (*Id.* at 96-97.)  She previously worked as a corrections officer, shipping

13

and receiving clerk, supply technician, and supply supervisor. (*Id.* at 97-98.) She struggled to get things done around the house because of her medical problems. (*Id.* at 99.) On a good day, she could get a load of laundry done, but needed help from friends or family to mop the floor and grocery shop. (*Id.*) Most of the time she was in bed with pain and would need to pace back and forth, lie down, stand, sit, and alternate positions, for pain relief. (*Id.* at 100.) She was in the army for five years and left in 2002. (*Id.*) Her medications caused side effects, including drowsiness, sleepiness, and blurred vision. (*Id.* at 100-01.)

Plaintiff began to experience pain all over her body in 1998, but her symptoms worsened when she stopped working in 2012. (*Id.* at 101-02.) Even though she had been treating her pain for years, her activity level continued to decrease. (*Id.* at 103.) She struggled with getting up in the morning and needed to lie down most of the day because of her pain. (*Id.* at 104.) Sometimes she could not wear clothes because her skin hurt too much, and she would need her son to help her to and from the bathroom. (*Id.* at 105.) She rarely socialized or went out in public, and would usually only leave the house for medical appointments. (*Id.*) On a good day, she would grocery shop and try to pick up food or cook something. (*Id.* at 106.)

Every six hours, Plaintiff took Gabapentin, Hydrocodone, and Methocarbamol for pain, as well as medication for blood pressure and IBS. (*Id.*) She was unable to take anti-inflammatories because they caused stomach bleeding. (*Id.* at 107-08.) She got drowsy an hour after taking her medication, which lasted for two to three hours, and would need to take a nap before she could do something. (*Id.* at 109.) She needed help from her family and friends to clean the house and to drive her to the grocery store or clinics. (*Id.* at 109-10.) She left her job in 2012, because she had injured her elbow and wrist. (*Id.* at 111-12.)

14

Plaintiff needed to stay close to a bathroom because her IBS caused colon spasms. (*Id.* at 111.) When she returned from Afghanistan, she started taking classes but switched to an online program because of her stomach issues. (*Id.* at 112-13.) She eventually dropped out because she was unable to complete the classes after her medication kicked in. (*Id.* at 113.) Because she needed to be close to a bathroom, she avoided going to public places. (*Id.*) Her fatigue and tiredness limited her functioning, and she struggled with thinking and memory loss. (*Id.* at 114-15.) She wrote down when she took her medication because she was afraid of overdosing. (*Id.* at 115.) She struggled with sleeping at night and required sleeping pills. (*Id.*) When feeling depressed, she would "shut down" and stay in bed. (*Id.*) She suffered from dry eyes and went to the doctor for "plugs" and re-wetting eye drops. (*Id.* at 116.)

Plaintiff had PTSD and struggled with socializing, paranoia, and anger control. (*Id.* at 117.) She experienced a traumatic event while serving in Bosnia, which triggered memories of childhood sexual abuse. (*Id.*) Her rheumatologist recommended weight loss as part of her treatment, and she participated in a diet and exercise program, but had given up because of knee and back issues. (*Id.* at 117-18.) She had skipped some of her mental health therapy sessions when she was unable to leave the house because of pain, and eventually stopped going because she kept getting new therapists and felt the sessions were not helping. (*Id.* at 119-20.)

### 2.    VE's Testimony

The VE testified that Plaintiff had previous work experience as a correctional officer, which was medium work with a SVP of 4; a supply technician or supplies clerk, which was heavy work with a SVP of 4; a shipping and receiving clerk, which was medium work with a SVP of 5; and a supply supervisor, which was light work with a SVP of 7. (*Id.* at 120-21.) A hypothetical person

with the same age, education, and work experience history as Plaintiff would not be able to sustain her prior work with the following limitations: never climb ladders, ropes, or scaffolds; never kneel or crawl; occasionally climb ramps and stairs, balance, stoop, and crouch; never use foot controls; no more than 10 percent of time exposure to certain environmental elements; no more than five percent of time contact with the public; and no more than occasional contact with coworkers and supervisors. (*Id.* at 121-22.) There was other available work that the hypothetical person could perform, including optical assembler (sedentary and SVP-2) with 12,100 jobs nationally; table worker (sedentary and SVP-2) with 10,000 jobs nationally; and dowel inspector (sedentary and SVP-2) with 30,000 jobs nationally, all of which were consistent with the DOT and the Occupational Outlook Handbook. (*Id.* at 122-24, 126-27.) If the same hypothetical person was further limited to bilateral overhead reaching no more than five percent of the time and to no more than occasional bilateral reaching (other than overhead), handling, fingering, and feeling, she would be precluded from all competitive work. (*Id.* at 124.) Chronic absenteeism of three days or more a month would also preclude competitive work. (Id. at 125.) The tolerance for unscheduled breaks per hour was one to six minutes for unskilled work and seven to nine minutes for skilled work, with no tolerance for recumbent rest. (*Id.* at 126.)

### D.   <u>ALJ's Findings</u>

The ALJ issued a decision denying benefits on August 31, 2018. (doc. 7-1 at 18-29.) At step one, he found that Plaintiff had not engaged in substantial gainful activity during the period from her alleged onset date of November 6, 2011, through her date last insured of December 31, 2016. (*Id.* at 20.) At step two, the ALJ found that she had the following severe impairments: fibromyalgia, IBS, carpal tunnel syndrome, anxiety disorder, major depressive disorder, PTSD, and obesity. (*Id.*)

16

Despite those impairments, at step three, the ALJ found that Plaintiff had no impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in the social security regulations. (*Id.* at 21.)

Next, the ALJ determined that Plaintiff retained the physical RFC to lift and carry no more than ten pounds occasionally and less than ten pounds frequently; sit for at least six hours out of an eight hour workday; stand and walk up to two hours out of an eight hour workday; occasionally climb ramps and stairs, but never climb ladders, ropes, or scaffolds; occasionally balance, stoop, or crouch, but never kneel or crawl; reach overhead bilaterally no more than five percent of an eight hour workday; frequently handle, finger, feel, and reach (other than overhead) with both upper extremities; have exposure, but no more than ten percent of the time, to the environmental factors of weather, cold/hot/wet/humid environments, vibration, moving/mechanical parts, electric shock, hazardous/exposed places, radiation, explosives, as well as fumes, odors, dusts, gases, and poor ventilation; and never use foot controls, and the mental RFC to perform simple work with understanding and carrying out simple one- or two-step instructions; deal with standardized situations with occasional or no variables in situations encountered on the job; perform basic arithmetic operations; read, write, and speak in simple sentences using normal word order; have contact with the public no more than five percent of an eight hour workday; and have no more than occasional contact with coworkers and supervisors, and she required unscheduled breaks of up to five minutes per hour. (*Id.* at 22-23.)

At step four, the ALJ determined that Plaintiff was unable to perform any past relevant work. (*Id.* at 27.)  At step five, the ALJ found that transferability of job skills was not material to the determination of disability because the Medical-Vocational Rules supported a finding that she was

not disabled whether or not she had transferable job skills, but considering her age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that she could perform. (*Id.* at 27.) Accordingly, the ALJ determined that Plaintiff had not been under a disability, as defined by the Social Security Act, at any time from November 6, 2011, the alleged onset date, through December 31, 2016, the date last insured. (*Id.* at 29.)

## II.  STANDARD OF REVIEW

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. §§ 405(g), 1383(C)(3). Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those

governing the determination under a claim for supplemental security income. *See id.* The court may therefore rely on decisions in both areas without distinction in reviewing an ALJ's decision. *See id.*

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563-64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

1.    An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2.    An individual who does not have a "severe impairment" will not be found to be disabled.

3.    An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4.    If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5.    If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)).

Under the first four steps of the analysis, the burden lies with the claimant to prove disability.

19

*Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id.* Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

### III. ISSUES FOR REVIEW

Plaintiff presents three issues for review:

1.    The Administrative Law Judge's residual functional capacity assessment is not supported by any medical opinion of record and therefore is not supported by substantial evidence of record.

2.    The Administrative Law Judge erred in failing to properly evaluate [Plaintiff's] fibromyalgia in determining her residual functional capacity.

3.    The vocational expert's testimony does not provide substantial evidence to support a finding that there are jobs existing in significant in the national economy that can be performed by an individual of [Plaintiff's] assessed vocational profile.

(doc. 12 at 5.)

### IV. RFC ASSESSMENT

Plaintiff argues that the ALJ's RFC assessment is not supported by substantial evidence. (doc. 12 at 16.)

Residual functional capacity, or RFC, is defined as the most that a person can still do despite

recognized limitations.  20 C.F.R. at § 404.1545(a)(1).  The RFC determination is a combined "medical assessment of an applicant's impairments with descriptions by physicians, the applicant, or others of any limitations on the applicant's ability to work."  *Hollis v. Bowen*, 837 F.2d 1378, 1386–87 (5th Cir. 1988) (per curiam).  It "is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." Social Security Ruling (SSR) 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996).  An individual's RFC should be based on all of the relevant evidence in the case record, including opinions submitted by treating physicians or other acceptable medical sources.  20 C.F.R. § 404.1545(a)(3); SSR 96-8p, 1996 WL 374184, at *1.

The ALJ "is responsible for assessing the medical evidence and determining the claimant's residual functional capacity."  *Perez v. Heckler*, 777 F.2d 298, 302 (5th Cir. 1985).  The ALJ may find that a claimant has no limitation or restriction as to a functional capacity when there is no allegation of a physical or mental limitation or restriction regarding that capacity, and no information in the record indicates that such a limitation or restriction exists.  *See* SSR 96-8p, 1996 WL 374184, at *1.  The ALJ's RFC decision can be supported by substantial evidence even if he does not specifically discuss all the evidence that supports his decision or all the evidence that he rejected.  *Falco v. Shalala*, 27 F.3d 160, 163-64 (5th Cir. 1994).  A reviewing court must defer to the ALJ's decision when substantial evidence supports it, even if the court would reach a different conclusion based on the evidence in the record.  *Leggett*, 67 F.3d at 564.

Nevertheless, the substantial evidence review is not an uncritical "rubber stamp" and requires "more than a search for evidence supporting the [Commissioner's] findings."  *Martin v. Heckler*, 748 F.2d 1027, 1031 (5th Cir. 1984) (citations omitted).  The Court "must scrutinize the record and

take into account whatever fairly detracts from the substantiality of the evidence supporting the" ALJ's decision. *Id*. Courts may not reweigh the evidence or substitute their judgment for that of the Secretary, however, and a "no substantial evidence" finding is appropriate only if there is a "conspicuous absence of credible choices" or "no contrary medical evidence." *See Johnson*, 864 F.2d at 343 (citations omitted).

Here, after making a credibility finding regarding Plaintiff's alleged symptoms and limitations, and reviewing the evidence of record, the ALJ determined that Plaintiff had the physical RFC to lift and carry no more than ten pounds occasionally and less than ten pounds frequently; sit for at least six hours out of an eight hour workday; stand and walk up to two hours out of an eight hour workday; occasionally climb ramps and stairs, but never climb ladders, ropes, or scaffolds; occasionally balance, stoop, or crouch, but never kneel or crawl; reach overhead bilaterally no more than five percent of an eight hour workday; frequently handle, finger, feel, and reach (other than overhead) with both upper extremities; have exposure, but no more than ten percent of the time, to the environmental factors of weather, cold/hot/wet/humid environments, vibration, moving/mechanical parts, electric shock, hazardous/exposed places, radiation, explosives, as well as fumes, odors, dusts, gases, and poor ventilation; and never use foot controls. She had the mental RFC to perform simple work with understanding and carrying out simple one- or two-step instructions; deal with standardized situations with occasional or no variables in situations encountered on the job; perform basic arithmetic operations; read, write, and speak in simple sentences using normal word order; have contact with the public no more than five percent of an eight hour workday; and have no more than occasional contact with coworkers and supervisors, and she required unscheduled breaks of up to five minutes per hour. (doc. 7-1 at 22-23.)

A.    **Lay Opinion**

Plaintiff argues that the RFC is not supported by medical opinion evidence, but wholly based on the ALJ's lay interpretation of raw medical data in violation of *Ripley v. Chater*, 67 F.3d 552 (5th Cir. 1995).  (doc. 12 at 16-18.)  The Commissioner responds that substantial evidence supports the ALJ's RFC assessment.  (doc. 13 at 9-16.)

In *Ripley*, the claimant argued that the ALJ failed to develop the record fully and fairly by finding that he could perform sedentary work even though there was no medical testimony to support that conclusion.  *Ripley*, 67 F.3d at 552.  The Fifth Circuit noted that although an ALJ should usually request a medical source statement describing the types of work that the applicant was still capable of performing, the absence of such a statement did not necessarily make the record incomplete.  *Id*.  Rather, the court had to consider whether there was substantial evidence in the record to support the ALJ's decision.  *Id*.  The record contained "a vast amount of medical evidence" establishing that the claimant had a back problem, but it did not clearly establish the effect of that problem on his ability to work, so the ALJ's RFC determination was not supported by substantial evidence.  *Id*. The Fifth Circuit remanded the case with instructions to the ALJ to obtain a report from a treating physician.  *Id*. at 557-58.  Notably, it rejected the Commissioner's argument that the medical evidence discussing the extent of the claimant's impairment substantially supported the ALJ's RFC assessment, finding that it was unable to determine the effects of the claimant's condition on his ability to work absent reports from qualified medical experts.  *Id*. at 558 n.27; *see also Oderbert v. Barnhart*, 413 F. Supp.2d 800, 803 (E.D. Tex. 2006) ("*Ripley* clarifies that an [ALJ] cannot determine from raw medical data the effects of impairments on claimants' ability to work.").

1.    **Physical RFC**

23

Here, the ALJ did not explain how he determined that Plaintiff was able to lift and carry no more than ten pounds occasionally and less than ten pounds frequently; stand and walk up to two hours out of an eight hour workday; never kneel or crawl; only reach overhead bilaterally no more than five percent of an eight hour workday; have exposure, but no more than ten percent of the time, to the environmental factors of weather, cold/hot/wet/humid environments, vibration, moving/mechanical parts, electric shock, hazardous/exposed places, radiation, explosives, as well as fumes, odors, dusts, gases, and poor ventilation; and never use foot controls. (*See* doc. 7-1 at 22-23.)  He considered Plaintiff's longitudinal medical records, which noted that she had worsening diffuse pain in the back, shoulders, chest wall, and thighs, and had several muscular tender points in her shoulder, upper extremities, chest, hips, and bilateral knees.  (*Id.* at 24-25.)  He also referenced the clinical notes from a February 2, 2016 medical visit, which indicated that Plaintiff had decreased range of motion in her shoulders.  (*Id.* at 25.)  None of that medical evidence addressed the effects of her physical conditions on her ability to work, however.  *See Browning v. Barnhart*, No. 1:01-CV-637, 2003 WL 1831112, at *7 (E.D. Tex. Feb. 27, 2003) (finding despite the fact that there was a vast amount of treating sources' medical evidence in the record establishing that plaintiff suffered from certain impairments, including voluminous progress reports, clinical notes, and lab reports, "none [made] any explicit or implied reference to effects these conditions h[ad] on claimant's ability to work" and the ALJ could not rely on that "raw medical evidence as substantial support for" the claimant's RFC).

He also considered both SAMCs' opinions that Plaintiff was "capable of light work, with some postural limitations."  (*See* doc. 7-1 at 26.)  He gave the opinions "little weight," explaining that "[a]lthough the opinions are generally consistent with the record at the time, they were made

without the benefit of additional evidence available at the hearing, which show[ed] greater limitations in the claimant's physical capacity." (*Id.*)  While the ALJ may choose to reject the opinions of the SAMCs, "he cannot independently decide the effects of Plaintiff's . . . impairments on [her] ability to work, as that is expressly prohibited by *Ripley*." *Shugart v. Astrue*, No. 3:12-CV-1705-BK, 2013 WL 991252, at *5 (N.D. Tex. Mar.13, 2013).  There are no medical opinions in the record regarding the effects Plaintiff's physical impairments had on her ability to work, particularly involving exertional and postural limitations, so the ALJ appears to have relied on his own interpretation of the medical and other evidence, which he may not do.  *See Williams v. Astrue*, 355 F. App'x 828, 832 n.6 (5th Cir. 2009) ("[a]n ALJ may not–without the opinions from medical experts–derive the applicant's [RFC] based solely on the evidence of his or her claimed medical conditions, [and] an ALJ may not rely on his own unsupported opinion as to the limitations presented by the applicant's medical conditions."); *Newsome v. Barnhart*, No. 3:03-CV-3030-D, 2004 WL 3312833, at *4 (N.D. Tex. Oct. 8, 2004) ("[A]lthough the instant record contains some substantial evidence that [the claimant] suffers from 'mild' fibromyalgia that has improved with medication, the record lacks substantial evidence to support the ALJ's findings concerning the effect of this condition on her work-related abilities.").

## 2.    Mental RFC

The ALJ also did not explain how he determined that Plaintiff was able to deal with standardized situations with occasional or no variables in situations encountered on the job; to perform basic arithmetic operations; to read, write, and speak in simple sentences using normal word order; to interact with the public no more than five percent of an eight hour workday; and to interact no more than occasionally with coworkers and supervisors, and that she required unscheduled breaks

of up to five minutes per hour.  (*See* doc. 7-1 at 23.)  The ALJ considered Dr. Cofield's psychological consultative examination and his findings that Plaintiff "was capable of both understanding the meaning of filing for benefits and managing any funds awarded," and that "her condition was unlikely to change substantively in the next 12 months." (*Id.* at 26.)  He gave "great weight" to Dr. Cofield's opinion because it was based on direct examination of Plaintiff and was "consistent with the medical evidence, which show[ed] that the claimant [was] psychologically capable of at least simple, unskilled work." (*Id.*)  Notably, Dr. Cofield did not offer an opinion on the effects of Plaintiff's impairments on her ability to work; he only narrowly opined that Plaintiff was capable of managing her own funds and was able to understand the meaning of filing for benefits. (*Id.* at 626.)   "[E]vidence which merely describes Plaintiff's medical conditions is insufficient to support the ALJ's RFC determination." *See Turner v. Colvin*, No. 3:13-CV-1458-B, 2014 WL 4555657, at *5 (N.D. Tex. Sept. 12, 2014) (citing *Ripley*, 67 F.3d at 557).

The ALJ referenced Plaintiff's GAF scores of 55 in February 2012, and 65 in May 2012,[5] but attributed "little weight" to them, explaining that GAF scores are not designed to explain the types of limitations of a person or her ability to hold a job.  (doc. 7–1 at 25.)  He considered Plaintiff's 100% VA disability rating, finding the limitations attributed to PTSD and IBS "consistent with the diagnoses and objective evidence in the medical record," but attributed "little weight" to

---

[5]GAF is a standardized measure of psychological, social, and occupational functioning used in assessing a patient's mental health.  *See Boyd v. Apfel*, 239 F.3d 698, 700 n. 2 (5th Cir. 2001). A GAF score of 51 to 60 indicates a "moderate" impairment in social, occupational, or school functioning, while a GAF score of 61 to 70 indicates only "mild" impairment.  *American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) p. 34 (4th ed., rev. 2000).  Notably, "in the updated version of the DSM, the American Psychiatric Association no longer recommends the use of the GAF scale as a diagnostic tool for assessing a patient's functioning due to 'its conceptual lack of clarity ... and questionable psychometrics in routine practice.' " *Spencer v. Colvin*, No. EP-15-CV-0096-DCG, 2016 WL 1259570, at *6 n.8 (W.D. Tex. Mar. 28, 2016) (quoting *American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders* (DSM-V) p. 16 (5th ed. 2013)); *see also Jackson v. Colvin*, No. 4:14-CV-756-A, 2015 WL 7681262, at *3 (N.D. Tex. Nov. 5, 2015), *adopted by* 2015 WL 7582339 (N.D. Tex. Nov. 25, 2015).

the rating because it was not based on Social Security Administration policy. (*Id.* at 26.) The ALJ also considered both opinions of the SAPCs but gave them "light weight" because they were not consistent with the medical evidence, which showed Plaintiff had "difficulty with more than simple tasks" and was "more comfortable in environments requiring little interpersonal interaction. (*Id.*) While the ALJ may choose to reject the VA rating,[6] the GAF scores, and the opinions of the SAPCs, as noted, he cannot independently decide the effects of Plaintiff's impairments on her ability to work. *See Shugart*, 2013 WL 991252, at *5; *Fitzpatrick v. Colvin*, No. 3:15-CV-3202-D, 2016 WL 1258477, at *8 (N.D. Tex. Mar. 31, 2016) (finding that the ALJ "improperly made an independent RFC finding" as to "the effects of [the claimant's] mental impairments on [her] ability to work" where "other than the opinions of the two [state agency medical consultants]," there was no evidence in the record as to the claimant's ability to work despite his impairments). There are no medical opinions in the record regarding the effects Plaintiff's mental impairments had on her ability to work, particularly in the areas of concentration and persistence, social interactions, and adaptation. *See Thornhill v. Colvin*, No. 3:14-CV-335-M, 2015 WL 232844, at *10 (N.D. Tex. Dec. 15, 2014), *adopted by* 2015 WL 232844 (N.D. Tex. Jan. 16, 2015) (explaining that an ALJ cannot "independently decide the effects of Plaintiff's mental impairments on her ability to perform

---

[6]A VA rating is not legally binding on the Commissioner, but the Fifth Circuit considers it "evidence that is entitled to a certain amount of weight and must be considered by the ALJ." *Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001) (citations omitted); *see also* SSR 06–03p, 2006 WL 2329939 at *6 (S.S.A. Aug. 9, 2006) ("[E]vidence of a disability decision by another governmental or nongovernmental agency cannot be ignored and must be considered."). While an ALJ is free to scrutinize a VA disability determination, his "decision must show meaningful consideration of the VA disability determination and provide specific reasons for giving the determination diminished weight." *Albo v. Colvin*, No. 2:12-CV-0066, 2013 WL 5526584, at *8 (N.D. Tex. Sept. 30, 2013) (citing *Chambliss*, 269 F.3d at 523). Notably, an ALJ cannot disregard the VA's disability rating simply because VA disability determinations are not binding on the Commissioner. *See Allison v. Berryhill*, No. 1:16-CV-0170-BL, 2018 WL 1274853, at *6 (N.D. Tex. Feb. 16, 2018) (recognizing that although a "VA disability rating is not binding in the social security context," "that fact does not permit an ALJ to simply disregard VA findings without comment or discussion."). Because Plaintiff does not specifically challenge the limited weight attributed to the VA's disability rating, the Court offers no opinion on whether the ALJ provided a valid basis for rejecting her VA rating.

work-related activities ... even if the ALJ believes he is simply giving Plaintiff the benefit of the doubt as to what limitations might apply").

The ALJ also relied on medical evidence, including treatment notes from the VA Clinic and Advanced Pain, in determining Plaintiff's mental RFC. (doc. 7-1 at 25.)  None of that evidence addressed the effects of Plaintiff's mental conditions on her ability to work. *See Browning*, 2003 WL 1831112, at *7.  As with his physical RFC determination, the ALJ appears to have relied on his own opinion when developing the mental RFC, which he may not do. *See Williams*, 355 F. App'x at 832 n.6; *Tyler*, 2016 WL 7386207 (finding that an ALJ impermissibly relied on his own medical opinion to develop his RFC determination).

Consequently, substantial evidence does not support the ALJ's RFC determination.  *See Geason v. Colvin*, No. 3:14-CV-1353-N, 2015 WL 5013877, at *5 (N.D. Tex. July 20, 2015) ("Because the ALJ erred in making an RFC determination without medical evidence addressing the effect of Plaintiff's impairment on her ability to work, the ALJ's decision is not supported by substantial evidence."); *see also Medendorp v. Colvin*, No. 4:12-CV-687-Y, 2014 WL 308095, at *6 (N.D. Tex. Jan. 28, 2014) (finding because the ALJ rejected the only medical opinion in the record that he had analyzed that explained the effects of the claimant's impairments on her ability to perform work, there was no medical evidence supporting the ALJ's RFC determination).

**B.**    **Harmless Error**

Because "[p]rocedural perfection in administrative proceedings is not required" and a court "will not vacate a judgment unless the substantial rights of a party have been affected," Plaintiff must show she was prejudiced by the ALJ's failure to rely on medical opinion evidence in assessing her RFC.  *See Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988) (per curiam).  To establish

prejudice, she must show that the ALJ's failure to rely on a medical opinion as to the effects her impairments had on her ability to work casts doubt onto the existence of substantial evidence supporting her disability determination.  *See McNair v. Comm'r of Soc. Sec. Admin.*, 537 F. Supp. 2d 823, 837 (N.D. Tex. 2008) ("Procedural errors in the disability determination process are considered prejudicial when they cast doubt onto the existence of substantial evidence in support of the ALJ's decision.") (citing *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988)).

The ALJ's failure to rely on a medical opinion in determining Plaintiff's RFC casts doubt as to whether substantial evidence exists to support the finding that she is not disabled.  *See Williams*, 355 F. App'x at 832 (finding the decision denying the claimant's claim was not supported by substantial evidence where the RFC was not supported by substantial evidence because the ALJ rejected the opinions of the claimant's treating physicians and relied on his own medical opinions as to the limitations presented by the claimant's back problems in determining the RFC); *see also Thornhill*, 2015 WL 232844, at *11 (finding prejudice "where the ALJ could have obtained evidence that might have changed the result—specifically, a medical source statement"); *Laws v. Colvin*, No. 3:14-CV-3683-B, 2016 WL 1170826 (N.D. Tex. Mar. 25, 2016) (reversing and remanding for further proceedings for lack of substantial evidence because the ALJ's failure to rely on a medical opinion in determining the plaintiff's RFC.  Accordingly, the error is not harmless, and remand is required on this issue.[7]

## IV.  RECOMMENDATION

The Commissioner's decision should be **REVERSED in part**, and the case should be **REMANDED** for further proceedings.

---

[7]Because remand is recommended based on the ALJ's lay opinion issue, and determination of Plaintiff's RFC on remand will likely affect the remaining issues, they will not be addressed here.

**SO RECOMMENDED**, on this 6th day of March, 2020.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE


## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 10 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

30